# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF INDIANA

08 MAR -3 AM 10: 32

| | |
|---|---|
| WELBORN BAPTIST FOUNDATION, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> STATE STREET GLOBAL ADVISORS, ) <br> INC., ) <br> STATE STREET BANK AND TRUST ) <br> COMPANY, and ) <br> YANNI PARTNERS, INC. ) <br> ) <br> Defendants. | Cause No. <br><br> **3 : 08-cv- 27 -RLY -WGH** |

## COMPLAINT

## DEMAND FOR JURY TRIAL

COMES NOW Plaintiff, Welborn Baptist Foundation, Inc. ("Welborn"), and for its causes of action against Defendants State Street Global Advisors, Inc. ("SSgA"), State Street Bank and Trust Company ("SSB," and collectively with SSgA, "State Street"), and Yanni Partners, Inc. ("Yanni"), states as follows:

### PARTIES, JURISDICTION AND VENUE

1.  Plaintiff Welborn is an Indiana corporation with its principal place of business in Evansville, Indiana.

2.  Defendant SSgA, a wholly-owned subsidiary of State Street Corporation, is a Delaware corporation with its principal place of business in Boston, Massachusetts.

3.  Defendant SSB, a wholly-owned subsidiary of State Street Corporation, is a Massachusetts Trust Company with its principal place of business in Boston, Massachusetts.

1425258.08

4.   Defendant Yanni is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania.

5.   SSgA, SSB and Yanni have continuous and systematic contacts within Indiana, including contacts directly relating to the subject matter of this action, so as to justify the exercise of specific and general jurisdiction in Indiana.

6.   Venue is proper in this District because a substantial part of the events and omissions giving rise to the claims asserted herein have occurred within the jurisdictional limits of this District and a defendant is subject to personal jurisdiction in this District.

7.   The amount in controversy in this action exceeds $75,000 exclusive of interest and costs.

8.   In addition, this case involves claims under the Securities Exchange Act of 1934 Section 10(b) and Rule 10(b)-5 promulgated thereunder.

9.   Accordingly, this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, diversity jurisdiction pursuant to 28 U.S.C. § 1332 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

**FACTUAL ALLEGATIONS**

10.   On or about January 21, 1999, Welborn entered into a contract with Yanni (the "Consulting Agreement"), whereby Yanni was to provide certain services in relation to the investment of Welborn's assets.

11.   Under the Consulting Agreement, Yanni agreed to "provide ongoing structural analysis, strategic asset allocation, investment and policy review, searches for investment managers as required (excluding alternative manager investment manager searches), and ongoing performance monitoring."

2

12. In the Consulting Agreement, Yanni also agreed, to, among other things, (1) present Welborn with an asset allocation structure that fit within its risk parameters and spending policy; (2) establish objectives and benchmarks for investment managers; (3) evaluate investment manager activities and performance achievements; (4) review and monitor performance of existing managers on an ongoing basis; and (5) address all communications to the Chairperson of Welborn.

13. In addition to the Consulting Agreement, Yanni also created a Statement of Investment Policy and Guidelines ("Investment Guidelines") for Welborn that further set forth Yanni's obligations to Welborn as Welborn's investment consultant.

14. In the Investment Guidelines that Yanni itself prepared, Yanni promised, among other things, to (1) monitor whether investment managers are performing satisfactorily in relation to the objectives set forth in the Investment Guidelines, other investment organizations managing similar pools of capital, and the recognized market indices; (2) monitor whether investment managers adhere to the Investment Guidelines; (3) monitor whether investment managers adhere to their stated philosophy and style; and (4) provide timely communication on all significant matters pertaining to Welborn's investments to the Executive Director of Welborn Baptist Foundation.

15. Yanni's Investment Guidelines require a certain allocation of Welborn's investments in commodities.

16. On or about January 16, 2007, pursuant to the Consulting Agreement, Welborn contracted with Yanni to research and recommend a commodities manager to fulfill the commodities allocation for the Welborn portfolio.

17. As part of its commodities manager search for Welborn, Yanni contacted State Street regarding the SSgA Enhanced DJ-AIG Commodities Index Fund (the "Commodities Fund").

18. The stated goal of SSgA's Commodities Fund was to outperform the DJ-AIG Commodities Index.

19. SSgA's Commodities Fund involves two different investments. The Commodities Fund consists of an investment in certain derivatives that provide exposure to the physical commodities markets and a collateral investment that supports the value of the exposure in the derivatives investment.

20. The collateral portion of SSgA's Commodities Fund is invested in SSgA's Limited Duration Bond Fund (the "LD Bond Fund").

21. In February of 2007, as part of Yanni's inquiry into a commodities manager for Welborn, State Street completed a questionnaire concerning the Commodities Fund.

22. In the February 2007 questionnaire, State Street touted the diversification and low-risk nature of the LD Bond Fund. State Street made certain representations, including that the LD Bond Fund "utilizes an expanded universe of securities that goes beyond typical money markets including: treasuries, agencies, collateralized mortgage obligations, adjustable rate mortgages, fixed rate mortgages, corporate bonds, asset-backed securities, futures, options and swaps;" that the LD Bond Fund is "designed to provide investors with liquidity that they require . . . and employ[s] a disciplined investment process that controls downside risk;" and that "the main risk in the portfolio is spread duration."

23. Yanni recommended the Commodities Fund to Welborn in February of 2007.

24. Yanni failed to analyze the actual structure and allocations of the Commodities Fund and LD Bond Fund or to investigate whether the Commodities Fund and LD Bond Fund adhered to the philosophy and style stated by State Street before recommending the Commodities Fund to Welborn.

25. Subsequently, and before Welborn invested in the Commodities Fund, the Commodities Fund underperformed the DJ-AIG Commodities Index in the 1st Quarter of 2007.

26. Yanni, acting as a fiduciary for Welborn, conducted a conference call with State Street on April 9, 2007. In the April 9, 2007 conference call, State Street represented that the cause of a recent underperformance in the Commodities Fund was the collateral investments held in the LD Bond Fund. Specifically, State Street represented that the losses in the LD Bond Fund were caused by a 4% exposure to BBB rated sub-prime mortgage securities. State Street stated that the LD Bond Fund's current exposure to sub-prime issues was trimmed to 2% to manage risk. State Street did not disclose that the remainder of the LD Bond Fund was also tied to the sub-prime mortgage market.

27. Despite the Commodities Fund's underperformance, Yanni once again failed to investigate the actual structure and allocation of the Commodities Fund.

28. In fact, on April 24, 2007, Yanni issued a letter to its clients affirming its support of the Commodities Fund. In the April 24, 2007 letter, Yanni stated that the Commodities Fund's exposure to mortgages was the primary reason for its underperformance, that the sub-prime mortgage market decline was an extreme outlier, and that the Commodities Fund had pared back its exposure to these mortgages.

29. On May 10, 2007, in a presentation to Yanni and one of its clients, State Street represented that the LD Bond Fund's typical portfolio consists of 55% asset-backed securities,

5

25% commercial mortgage-backed securities, 10% mortgage-backed securities, 5% agency and 5% cash. Through this date, in touting the diversification and low-risk nature of the LD Bond Fund, State Street never disclosed, and Yanni never investigated, the actual allocation within the LD Bond Fund.

30. On or about July 13, 2007, based upon State Street's and Yanni's representations, Welborn invested approximately $6.2 million into the Commodities Fund.

31. On or about July 24, 2007, after the Commodities Fund substantially underperformed the DJ-AIG Commodities Index in the beginning of July, Yanni again conducted a conference call with State Street. During the July 24, 2007 conference call, State Street, for the first time, disclosed that the LD Bond Fund, the reason for the recent underperformance, had up to 100% exposure to the sub-prime mortgage market. State Street disclosed that, as of June 30, 2007, 82% of the LD Bond Fund portfolio was invested in the sub-prime mortgage market in asset-backed securities, and the remainder was invested in cash instruments.

32. Prior to the July 24, 2007 conference call, State Street had only disclosed the very small percentage of the portfolio that was invested in BBB sub-prime instruments. State Street never disclosed that the large percentage of the remaining portfolio was also tied to sub-prime mortgages.

33. On July 27, 2007, after these alarming disclosures, Welborn's investment committee had a meeting with Yanni. During the July 27, 2007 meeting, Yanni failed to disclose State Street's misrepresentations and omissions and failed to disclose any of the issues or concerns with the LD Bond Fund.

34. On August 2, 2007, Yanni sent an e-mail to Welborn discussing recent developments in the market. Again, Yanni failed to disclose any issues or concerns with the LD Bond Fund to Welborn.

35. Throughout this time, Yanni continually breached its contract with Welborn by failing to investigate the structure and allocation of the LD Bond Fund and by failing to disclose State Street's misrepresentations and omissions in a timely manner.

36. Further, as Welborn's investment advisor, Yanni was a fiduciary and agent to Welborn and owed certain fiduciary duties, including duties of loyalty and care, to Welborn. Yanni breached those fiduciary duties by failing to investigate the Commodities Fund and LD Bond Fund, by failing to disclose the Commodities Fund's underperformance, and by failing to disclose State Street's misrepresentations and omissions immediately.

37. Finally, on August 3, 2007, Yanni sent a notice to Gary Bauer, Welborn's Chief Financial Officer, recommending the immediate termination of the Commodities Fund. However, the Consulting Agreement and Investment Guidelines mandated that all such notices were to be addressed to John Dunn, Welborn's Chairperson, and to Marjorie Soyugenc, Executive Director. Accordingly, Yanni further breached the Consulting Agreement, the Investment Guidelines, and its other obligations and duties to Welborn by sending this notice to the wrong person, resulting in further delays and additional damages to Welborn.

38. In its August 3, 2007 notice, Yanni stated that its recommendation was based on (1) the LD Bond Fund's extremely high concentration in the asset-backed securities sector, which included sub-prime mortgage exposure; (2) Yanni's conclusion that State Street did not adequately and clearly disclose the actual sector allocations within the LD Bond Fund, which were inconsistent with the portfolio description and characteristics State Street had provided to

Yanni; (3) Yanni's concerns with State Street's risk management process and execution; and (4) State Street's failure to respond to Yanni's requests for information and communication regarding the Commodities Fund promptly.

39. As a direct and proximate result of State Street's and Yanni's improper conduct, Welborn suffered realized losses of over $1,000,000.00 in its investments in the Commodities Fund.

40. In addition, Welborn suffered further damages as a result of this inappropriate investment, including but not limited to opportunity costs, transaction fees, and other expenses and costs.

### COUNT I
### Violation of Federal and Indiana Securities Laws
### (State Street)

41. Plaintiff realleges and incorporates the allegations contained in Paragraphs 1 through 40 as though fully set forth herein.

42. Under Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)], it is "unlawful for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ."

43. Rule 10(b)-5 [17 C.F.R. § 240.10(b)-5], promulgated under this Section, states that it is "unlawful for any person, directly or indirectly . . . (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business

which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

44.  Indiana Code § 23-2-1-12 makes it "unlawful for any person in connection with the offer, sale or purchase of any security, either directly or indirectly, (1) to employ any device, scheme or artifice to defraud, or (2) to make any untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of circumstances under which they are made, not misleading, or (3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person."

45.  State Street made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading in connection with its sale of the Commodities Fund to Welborn.

46.  Specifically, State Street knowingly, or with reckless disregard, made certain untrue statements regarding the diversification and risk in the LD Bond Fund. State Street's misrepresentations include the following, among others:

   a.  that the LD Bond Fund "is designed to provide investors with the liquidity that they require while earning an incremental yield over traditional cash vehicles and employing a disciplined investment process that controls downside risk;"

   b.  that "[t]he first step in the investment process for our Limited Duration Bond Fund is to build and maintain a core portion of the portfolio that offers liquidity;"

   c.  that "[t]he main risk in the portfolio is spread duration;"

    d.    that the LD Bond Fund "utilizes an expanded universe of securities that goes beyond typical money markets including: treasuries, agencies, collateralized mortgage obligations, adjustable rate mortgages, fixed rate mortgages, corporate bonds, asset-backed securities, futures, options and swaps;" and

    e.    that certain losses in the LD Bond Fund were caused by a 4% exposure to BBB rated sub-prime mortgage securities, and the exposure to sub-prime issues was trimmed to 2% to manage risk.

47.    State Street further omitted to disclose material facts that made certain statements by State Street misleading regarding LD Bond Fund's actual sector allocation, exposure to sub-prime mortgages, and liquidity risk. Specifically, State Street made the following omissions:

    a.    State Street failed to disclose the remainder of the LD Bond Fund was also tied to the sub-prime mortgage market when it represented that the losses in the LD Bond Fund were caused by a 4% exposure to BBB rated sub-prime mortgage securities and that the LD Bond Fund's current exposure to sub-prime issues was trimmed to 2% to manage risk.

    b.    State Street failed to disclose that the actual sector allocation in the LD Bond Fund consisted of 82-100% exposure to sub-prime mortgage issues in asset-backed securities after representing that the LD Bond Fund's typical portfolio consists of 55% asset-backed securities, 25% commercial mortgage-backed securities, 10% mortgage-backed securities, 5% agency and 5% cash.

48. State Street disclosed to Yanni (but not Welborn) the true lack of diversification and exposure to the sub-prime mortgage market only after significant underperformance by the LD Bond Fund.

49. Further, State Street later represented that the LD Bond Fund's underperformance was a result of the portfolio's fundamental risk factor of liquidity risk, in direct contradiction to its previous statements above.

50. But for State Street's misrepresentations and omissions, Welborn would have invested in other, more appropriate, securities.

51. As a direct and proximate result of State Street's misrepresentations and omissions, Welborn invested in the LD Bond Fund and incurred substantial losses.

WHEREFORE, Plaintiff Welborn prays the Court for damages adequate to compensate Plaintiff for losses suffered due to State Street's violations of Federal and Indiana securities laws, pre- and post-judgment interest, costs of suit, and expenses, including reasonable attorneys' fees, and for such other relief as the Court deems just and equitable.

### COUNT II
### Fraud and Intentional Misrepresentation
(State Street)

52. Plaintiff realleges and incorporates the allegations contained in Paragraphs 1 through 51 as though fully set forth herein.

53. State Street knowingly, or with reckless disregard, made false representations regarding the diversification and risk associated with the LD Bond Fund and omitted material facts relating to the diversification and risk of the LD Bond Fund.

54. State Street made these false representations and omitted material facts to induce Welborn to invest in the Commodities Fund.

55. Welborn justifiably relied upon State Street's representations and omissions in investing in the Commodities Fund.

56. State Street's conduct was malicious and fraudulent and was not merely negligent or an honest error in judgment.

57. As a direct and proximate result of State Street's misrepresentations and omissions, Welborn has suffered substantial damages.

WHEREFORE, Plaintiff Welborn prays the Court for damages adequate to compensate Plaintiff for losses suffered due to State Street's intentional misrepresentations, punitive damages, pre- and post-judgment interest, costs of suit, and expenses, including reasonable attorneys' fees, and for such other relief as the Court deems just and equitable.

## COUNT III
### Negligent Misrepresentation
### (State Street and Yanni)

58. Plaintiff realleges and incorporates the allegations contained in Paragraphs 1 through 57 as though fully set forth herein.

59. State Street and Yanni made the aforementioned misrepresentations regarding the diversification and risk associated with the LD Bond Fund.

60. State Street and Yanni failed to exercise reasonable care to determine the truth or falsity of these representations.

61. State Street's and Yanni's representations were false.

62. Welborn justifiably relied on State Street's and Yanni's representations regarding the diversification and risk of the LD Bond Fund in investing in the Commodities Fund.

63. As a direct and proximate result of Defendants' misrepresentations, Welborn has suffered substantial damages.

WHEREFORE, Plaintiff Welborn prays the Court for damages adequate to compensate Plaintiff for losses suffered due to Defendants' negligent misrepresentations, pre- and post-judgment interest, costs of suit, and expenses, including reasonable attorneys' fees, and for such other relief as the Court deems just and equitable.

## COUNT IV
## BREACH OF CONTRACT
### (Yanni)

64.     Plaintiff realleges and incorporates the allegations contained in Paragraphs 1 through 63 as though fully set forth herein.

65.     On or about January 21, 1999, Welborn and Yanni entered into an investment consulting agreement (the "Consulting Agreement").

66.     Pursuant to the terms of the Consulting Agreement, in return for the payment of certain fees by Welborn, Yanni promised to, among other things:

    a.   provide Welborn with ongoing structural analysis, strategic asset allocation, investment policy review, search for investment managers as required, and monitor ongoing performance;

    b.   present Welborn with an asset allocation structure that fits within its risk parameters and spending policy;

    c.   establish objectives and benchmarks for investment managers;

    d.   evaluate investment manager activities and performance achievements;

    e.   review and monitor performance of existing managers on an ongoing basis; and

    f.   address all communications to Welborn's Chairperson.

67. Yanni also created a Statement of Investment Policy and Guidelines ("Investment Guidelines") for Welborn that further set forth Yanni's obligations to Welborn as Welborn's investment consultant.

68. Under the Investment Guidelines, Yanni was obligated to, among other things:

   a. monitor whether investment managers are performing satisfactorily in relation to (1) the objectives set forth in the Investment Guidelines, (2) other investment organizations managing similar pools of capital, and (3) the recognized market indices;

   b. monitor whether investment managers adhere to the Investment Guidelines;

   c. monitor whether investment managers adhere to their stated philosophy and style; and

   d. provide timely communication on all significant matters pertaining to Welborn's investments to the Executive Director of Welborn Baptist Foundation.

69. Yanni has breached the Consulting Agreement and Investment Guidelines by, for example:

   a. failing to provide adequate structural analysis of the Commodities Fund;

   b. failing to establish objectives and benchmarks for the Commodities Fund;

   c. failing to adequately monitor the performance of the Commodities Fund;

   d. failing to monitor whether the Commodities Fund adhered to its stated philosophy and style;

   e. failing to present a commodities manager suitable to Welborn's stated investment objectives; and

   f. failing to timely notify the correct individuals at Welborn of the problems with the Commodities Fund.

70. As a result of Yanni's breaches, Welborn has suffered damages of over $1,000,000.00 through its investments in the Commodities Fund.

71. Welborn has performed its duties under the Consulting Agreement and the Investment Guidelines.

WHEREFORE, Plaintiff Welborn prays the Court for damages adequate to compensate Plaintiff for losses suffered due to Yanni's breaches of contract, pre- and post-judgment interest, costs of suit, and expenses, including reasonable attorneys' fees, and for such other relief as the Court deems just and equitable.

## COUNT V
## Breach of Fiduciary Duties
## (Yanni)

72. Plaintiff realleges and incorporates the allegations contained in Paragraphs 1 through 71 as though fully set forth herein.

73. As Welborn's investment advisor, Yanni was a fiduciary and agent to Welborn and owed certain fiduciary duties, including duties of loyalty and care, to Welborn.

74. Yanni breached its fiduciary duties to Welborn by, among other things:

   a. failing to sufficiently investigate the Commodities Fund, including the diversification and risk associated with the LD Bond Fund, before recommending its purchase to Welborn;

  b. failing to disclose the Commodities Fund's underperformance after recommending its purchase to Welborn and before Welborn purchased the Commodities Fund; and

  c. failing to disclose State Street's misrepresentations and omissions and Yanni's negligent representations and omissions concerning the Commodities Fund to Welborn immediately upon learning of them.

75. Yanni's behavior was grossly negligent and was not merely negligent or an honest error in judgment.

76. As a direct and proximate result of Yanni's breach of its fiduciary duties, Welborn has suffered substantial damages.

WHEREFORE, Plaintiff Welborn prays the Court for damages adequate to compensate Plaintiff for losses suffered due to Yanni's breach of fiduciary duties, punitive damages, pre- and post-judgment interest, costs of suit, and expenses, including reasonable attorneys' fees, and for such other relief as the Court deems just and equitable.

## COUNT VI
### Negligence
### (Yanni)

77. Plaintiff realleges and incorporates the allegations contained in Paragraphs 1 through 76 as though fully set forth herein.

78. As Welborn's investment advisor, Yanni had a duty to investigate the securities recommended to Welborn and to disclose any material facts relevant to the investments recommended to and held by Welborn.

79. Yanni failed to exercise reasonable care to investigate the diversification and risk of the LD Bond Fund and failed to immediately disclose State Street's misrepresentations and omissions regarding the diversification and risk associated with the LD Bond Fund.

80. As a direct and proximate result of Yanni's breach of its duties to Welborn, Welborn has suffered substantial damages.

WHEREFORE, Plaintiff Welborn prays the Court for damages adequate to compensate Plaintiff for losses suffered due to Yanni's negligence, pre- and post-judgment interest, costs of suit, and expenses, including reasonable attorneys' fees, and for such other relief as the Court deems just and equitable.

Respectfully submitted,

_____
MICHELE S. BRYANT            IN# 14533-55A
THOMAS J. KIMPEL             IN# 5194-82
BAMBERGER, FOREMAN, OSWALD AND HAHN, LLP
20 NW 4th Street, 7th Floor
P.O. Box 657
Evansville, IN 47704-0657
Ph: (812) 425-1591
Fax: (812) 421-4936
Email: mbryant@bamberger.com
Email: tkimpel@bamberger.com


Richard B. Walsh, Jr.
David B. Helms
R. Bradley Ziegler
LEWIS, RICE, FINGERSH, L.C.
500 N. Broadway, Suite 2000
St. Louis, Missouri 63102
Ph: (314) 444-7600
Fax: (314) 241-6056

ATTORNEYS FOR PLAINTIFF,
WELBORN BAPTIST FOUNDATION, INC.